UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOMAS RIVERA TANCO,
      Plaintiff,


      v.                                            CIVIL ACTION NO. 17-10048-ADB


COMMISSIONER OF SOCIAL SECURITY,
      Defendant.


AMENDED REPORT AND RECOMMENDATION
ON MOTION TO REVERSE (#28) AND
DEFENDANT'S MOTION FOR ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER (#32).


KELLEY, U.S.M.J.


I. INTRODUCTION.


Plaintiff Tomas Rivera Tanco seeks reversal of the decision of defendant Commissioner of

Social Security denying him Supplemental Security Income benefits. (#28.) Defendant moves for

an Order affirming her[1] decision. (#32.) With the administrative record (#19) having been filed and

the issues fully briefed (##28, 33, 34), the cross motions stand ready for decision.

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

## II. BACKGROUND.

### A. Procedural History.

Plaintiff applied for Supplemental Security Income benefits on August 13, 2013,[2] alleging a disability onset date of May 1, 2011. (TR at 15, 159-67.) The claim was denied initially on November 12, 2013, and again upon reconsideration on January 24, 2014. (TR at 65-73, 74-85.) Mr. Tanco requested a hearing before an administrative law judge (ALJ) (TR at 117-118), which was held on May 14, 2015. (TR at 30-64.) Plaintiff appeared at the hearing and testified with the assistance of an interpreter; a vocational expert also testified. *Id.*

The ALJ issued a decision unfavorable to Mr. Tanco on November 25, 2015. (TR at 15-23.) On September 16, 2016, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (TR at 11, 6-10.)  Because of the denial, the ALJ's decision *de facto* became the final decision of the Acting Commissioner, subject to judicial review under 42 U.S.C. § 405(g).  The instant action was filed on January 10, 2017.[3] (#1.)

### B. Mental Health Conditions.[4]

On February 28, 2013, Mr. Tanco had an initial appointment with Ana Cabacoff, LICSW, of Family Services, Inc. (TR at 300.) Ms. Cabacoff's notes on March 14, 2013, identify plaintiff's

---

[2] There is some discrepancy with respect to the date of filing; defendant claims the filing date was August 22, 2013 rather than August 13, 2013. While the Application Summary reflects a filing date of August 22, 2013 (TR at 159), the ALJ stated the date as August 13, 2013 (TR at 17), and that will be the date used here. *See also* TR at 179. "TR" refers to the administrative record.

[3]  On October 27, 2016, Mr. Tanco filed notice that he had appointed counsel (TR at 5), and on December 12, 2016, the Appeals Council extended the time within which he could file a civil action. (TR at 1-2.)

[4] The recitation of medical evidence will be limited to that which is germane to plaintiff's appeal, i.e., his mental impairments.

problems as depression, sleep disturbance, angry outbursts and a history of trauma based on the violence he witnessed growing up in Puerto Rico. (TR at 300-01.) Her treatment recommendation was weekly or bi-weekly individual therapy with the objective of identifying emotional triggers of Mr. Tanco's depression and anxiety, implementing learned coping skills, and assisting in the verbalization and healing process. (TR at 301.) The only other medical records from Family Services, Inc., reflect appointments plaintiff had on August 21, 2013 and September 25, 2013, with psychiatrist Michael Kittay, M.D., for a psychiatric diagnostic evaluation and medication management. (TR at 348-52.)

Medical records show that Mr. Tanco received primary care treatment at Mercy Hospital in Springfield, Massachusetts from August 21, 2014 through April 30, 2015. (TR at 414-32.) Although he was receiving therapy services at School Street Counseling Institute Behavioral Network, Inc. ("School Street") in February 2015, because he could not get a psychiatric evaluation for a number of months, the medical providers at Mercy Hospital continued to prescribe his psychiatric medications. (TR at 414, 433.) The treatment notes from Mercy Hospital indicated that plaintiff's depression and sleep disturbances were stable on his medications, he was not suicidal, and his mood and affect were normal for the most part. (TR at 414, 416-17, 419, 422, 424-27, 431.)

Plaintiff's initial evaluation at School Street was conducted by Kadin Rodriguez-Rivera, Psy.D., on September 24, 2014. (TR at 390-404.) His mental status examination revealed his appearance, clothing, posture, body movement, speech, perception, thought process, orientation, memory and judgment all to be within normal limits. (TR at 400-01.) Mr. Tanco's eye contact was avoidant; his behavior was cooperative; his emotional state-mood was anxious, while his emotional state-affect noted appetite disturbance; he had auditory hallucinations and he displayed impaired

concentration. *Id.* The diagnosis was rule-out intermittent explosive disorder and rule-out antisocial personality disorder, major depression and posttraumatic stress disorder. (TR at 402.) Plaintiff was assigned a global assessment functioning (GAF) score of 52.[5] The recommended treatment plan was for individual weekly therapy sessions, and Mr. Tanco was referred for a psychiatric evaluation. (TR at 404.)

In his initial psychiatric evaluation performed by Eduardo Bianchi, M.D., at School Street on June 4, 2015, Mr. Tanco complained about depression, anxiety, avoiding groups of people due to panic attacks, insomnia, irritability, low concentration, forgetfulness and social isolation. (TR at 498.) On examination, Dr. Bianchi found plaintiff to be pleasant and friendly; he had good relatedness; he was initially mildly anxious; he was reportedly depressed and anxious; his thoughts, orientation, memory and insight were all within normal limits. (TR at 500-01.) Plaintiff's clinical disorders were found to be posttraumatic stress disorder (PTSD), major depressive disorder and panic disorder without agoraphobia. (TR at 502.)  His GAF score was 50.[6] *Id*. At an appointment with Dr. Bianchi on June 17, 2015, Mr. Tanco reported that there were no changes in his condition and that he felt calmer. (TR at 517.) On July 28, 2015, plaintiff related that his sleep had improved with Trazodone and he was generally calmer during the day, although his mood remained almost unchanged; his diagnoses and GAF score were the same. (TR at 505, 507-08.)

---

[5] A GAF score falling in the range of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (*DSM-IV*) 34 (4th Ed. 2000).

[6] A GAF score falling in the range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 34.

C. Medical Opinions.

Plaintiff refused a request that he undergo a psychological consultative evaluation in connection with the initial review of his application for benefits. (TR at 69.) On November 7, 2013, Mary Ford Clark, Psy.D., the state agency reviewer, determined that Mr. Tanco's anxiety disorders were not severe because his impairments did not significantly limit his physical or mental ability to do basic work activities. (TR at 71.) This conclusion was based, in part, on consideration of the fact that plaintiff had no restrictions in activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (TR at 71.)

On November 13, 2013, Ms. Cabacoff, plaintiff's treating therapist, completed a Psychiatric Disorder form that was co-signed by Dr. Kittay. (TR at 361-63.) This medical source statement reflected that Ms. Cabacoff had been counselling Mr. Tanco since February 28, 2013, and his most recent appointment had been on November 7, 2013. (TR at 361.) Ms. Cabacoff diagnosed plaintiff with depressive disorder, PTSD, and rule-out mood disorder with a GAF score of 56. *Id*. Plaintiff's attention and concentration were noted as presenting "psychological symptoms that would interfere with his timely completion of tasks," yet he was able to maintain "sustained attention without distraction" during therapy sessions. *Id.* Plaintiff self-reported as being easily forgetful. *Id*. Mr. Tanco seemed to isolate himself, but Ms. Cabacoff observed him to be "a responsible man" who was timely in attending his appointments and committed to treatment. *Id*. PTSD appeared to have had a severe emotional impact on his life. *Id.*

Ms. Cabacoff opined that plaintiff seemed capable of learning new tasks with supervision. (TR at 362.) She stated that Mr. Tanco was able to get along with others; plaintiff stated he was

capable of acting violently if provoked. *Id*. He was able to travel in public. *Id.* Ms. Cabacoff further opined that it appeared plaintiff's ability to complete tasks in a timely manner was limited in stressful situations. *Id.* No psychological testing had been done on Mr. Tanco. *Id*. His prescribed medications were Clonidine and Prozac. (TR at 363.) In Ms. Cabacoff's view, plaintiff's prognosis was guarded. *Id*.

On January 16, 2014, Ms. Cabacoff prepared a second Psychiatric Disorder form, again co-signed by Dr. Kittay.[7] (TR at 386-88.) Plaintiff's diagnosis was noted as PTSD, depressive disorder and intermittent explosive episodes; he was assigned a GAF score of 58. (TR at 386.) Ms. Cabacoff stated that plaintiff had been unable to function in a high structure capacity and had been unemployed for two years due to his interpersonal conflicts with authority figures. *Id*. Plaintiff continued to prefer to be alone, as he appeared to have difficulty with socialization; he claimed to be withdrawn and distant from others. (TR at 386, 387.) Mr. Tanco reported: poor concentration and attention over a period of time which interfered with completion of tasks; his distraction was due negative thoughts stemming from past painful experiences; and he was unable to retain information unless he wrote it down. (TR at 386.)

Ms. Cabacoff opined that plaintiff was a negative individual who had difficulty making decisions. (TR at 387.) He was seen as having a lot of difficulty managing stressful situations because of his tendency for explosive episodes and persistent bad mood. *Id.* Plaintiff's medications remained the same, as did his guarded prognosis.  (TR at 388.)

---

[7] The ALJ treated the November 2013 and January 2014 Psychiatric Disorder forms completed by Ms. Cabacoff and co-signed by Dr. Kittay as the opinions of Dr. Kittay. (TR at 21.)

On January 23, 2014, when reconsidering Mr. Tanco's application for benefits, state agency psychologist Lawrence Fieman, Ed.D., found that plaintiff's affective disorder (depression) and anxiety-related disorders were not severe. (TR at 81-82.) Dr. Fieman determined plaintiff had only mild restriction of activities of daily living and in maintaining concentration, persistence or pace; moderate difficulties in maintaining social functioning; and no repeated episodes of decompensation. (TR at 82.)

After the administrative hearing was held, on July 17, 2015, Mr. Tanco was examined by consultative psychologist David Husson, Psy.D. (TR at 472-76.) Plaintiff stated that he had moved back to the U.S. mainland from Puerto Rico about three and a half years earlier, and that he was living with a female friend in Springfield, Masschusetts. (TR at 472.) Someone gave him a ride to the examination, and he had arrived promptly. *Id.* Dr. Husson described plaintiff as casually dressed "with fairly adequate hygiene"; his behavior was appropriate and goal directed, although mildly constricted. *Id*.

Mr. Tanco described feeling sad every day, but said that his mood had been uplifted by Fluoxetine, his psychiatric medication. (TR at 473.) Despite the Trazadone he was prescribed for sleep, plaintiff claimed to sleep about four hours a night due to insomnia, and he had bad dreams three or four nights a week. *Id.* Plaintiff also reported sometimes hearing a whisper to his ear, which Dr. Husson attributed to his PTSD. *Id*.

With respect to vocational history, Mr. Tanco had worked in fast food restaurants in Puerto Rico, and as a security guard. (TR at 474.) He admitted to many verbal, and infrequent physical, altercations with a boss or co-worker when he felt under pressure that he was unable to handle. *Id*.

Regarding his daily activities, plaintiff related that he had a driver's license, but did not own a car. *Id.* He got up between 8:00 and 9:00 a.m., groomed himself and ate a light breakfast; he could prepare simple foods. *Id.* Mr. Tanco stated that he could follow short and simple written and verbal instructions. *Id.* He enjoyed watching, and could comprehend, sports and the news on television. *Id.* Plaintiff had a good relationship with his roommate, and preferred to stay at home. *Id.* He tried to go to sleep around 10:00 p.m., but often had difficulties. *Id.*

On Mr. Tanco's mental status examination, Dr. Husson found his affect to be constricted with seemingly mild dysphoric mood. (TR at 475.)  Plaintiff denied any suicidal/homicidal ideation, intent or planning; he showed no indication of phobias or paranoia. *Id.* His thought processing was coherent and clear; his levels of insight and judgment were fairly adequate. *Id.* Although Mr. Tanco's memory functioning seemed preserved for remote, recent, and recent past memories, his performance on the Rey 15-Item Memory test was "suboptimal." *Id.* He declined to undertake a serial 7s test, made no effort to spell "mundo" forward or backward, "presented as being unable to do a basic addition and subtraction word problem," and "ostensibly could not repeat even three digits forward and none backward." *Id.* Dr. Husson opined the plaintiff's performance raised concerns about the credibility of his responses and the level of his motivation/effort. *Id.*

In his functional capacity impressions, Dr. Husson stated that Mr. Tanco appeared capable of following short and simple instructions. *Id.* While he preferred to be alone, plaintiff did not have major withdrawal or isolation, and reported no aberrant or unusual behaviors. (TR at 475-76.) Dr. Husson opined that Mr. Tanco's pace, persistence and concentration were not markedly or severely limited; on examination his concentration was intact, questions did not need to be repeated, and he was able to stay on topic. (TR at 476.) Plaintiff appeared able to travel away from home, and to

assess normal hazards and dangers. *Id*. Dr. Husson "saw no clear indication that he would have major interpersonal difficulties at this time in regard to coworkers or supervisors." *Id*. Dr. Husson's diagnostic impressions were that plaintiff had a history of major depressive disorder, recurrent, severe, in partial remission; unspecified trauma and stressor-related disorder; history of antisocial personality disorder; and malingering, provisional. *Id*. Mr. Tanco's prognosis was considered fair. *Id*.

D. Plaintiff's Hearing Testimony.

Mr. Tanco testified that at the time of the administrative hearing he was forty-two years old, single with no children. (TR at 39-40, 42.)  Born in Puerto Rico, at the time of the hearing he lived with a female friend in a house in Springfield, Massachusetts. (TR at 37, 40, 52.) Plaintiff received his GED in Puerto Rico. (TR at 40.) He had been a taxi driver in Puerto Rico, but never held a driver's license there. (TR at 41.) Mr. Tanco had a Massachusetts driver's license after passing the driving test in English, but he did not own a car. (TR at 41- 42.) Plaintiff explained that he had spoken English a great deal in Puerto Rico, and that he read to improve his English since coming to Massachusetts. (TR at 42.)

Mr. Tanco had also worked as a mechanic in Puerto Rico. (TR at 43.) While not formally schooled in the trade, his extended family had a long history of working as mechanics. *Id.* Plaintiff testified he could fix anything in a car. *Id*. He held no licenses or certifications, had not been in the military, and had never been in jail or prison. *Id*. Mr. Tanco received food stamps and was covered under Mass Health. (TR at 43-44.)

Plaintiff was not working at the time of the hearing, and had not worked at all since his onset date in May of 2011. (TR at 44.) He testified that he stopped working because he had a lot of

9

emotional issues, and an anger issue. *Id*. He fixed cars on his own, but made little money. *Id.* Mr. Tanco viewed his biggest problems as psychological; he was very depressed. (TR at 46.) He did not like to be around people, and lost control over small things. (TR at 47.) Plaintiff was seeing a therapist weekly, and was on medications to stabilize his mood and depression. *Id.* His depression caused him to want to stay in the house and be alone; he could not deal with pressure. (TR at 49.) Mr. Tanco did not know if he was being treated for anxiety. (TR at 50.)

Plaintiff sometimes helped out around the house by doing the dishes, making the bed, doing his laundry, cleaning, and taking out the garbage. (TR at 52.) He went to the store and bought his own food, but his friend did the cooking. *Id*. He did not engage in any type of exercise. *Id*. Mr. Tanco had a distant relationship with his family and no friends in Massachusetts, but many friends in Puerto Rico. (TR at 53-54.) He claimed to do little during the day, although he liked to read and he watched television or his telephone. (TR at 55-57.)

### III. <u>STANDARD OF REVIEW</u>.

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The

Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see Libby v. Astrue*, 473 Fed. Appx. 8, 8 (1st Cir. 2012); *Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir. 1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). As the First Circuit explained:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *Charkowski v. Berryhill*, No. 15-13356-GAO, 2017 WL 1080910, at *1 (D. Mass. Mar. 22, 2017).  In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *See Ward v. Commissioner of Social Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); *Torres-Martinez v. Colvin*, No. 3:16-cv-30016-KAR, 2017 WL 1075072, at *5 (D. Mass. Mar. 21, 2017).  Finally, "[e]ven in the presence of substantial evidence,

however, the Court may review conclusions of law and invalidate findings of fact that are derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Malone v. Colvin*, 238 F. Supp. 3d 151, 162 (D. Mass. 2017) (internal quotation marks and citations omitted).

## IV. DISCUSSION.

To qualify for Supplemental Security Income benefits, a claimant must prove that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Title 42 U.S.C. §1382c(a)(3)(A). In this case, the ALJ conducted the familiar five-step evaluation process used to determine whether an adult is disabled. *See* 20 C.F.R. § 416.920(a); *Goodermote v. Secretary of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982); *Torres-Martinez,* 2017 WL 1075072, at *4.  The ALJ concluded that: 1) plaintiff has not engaged in substantial gainful activity since August 13, 2013,  the application date; 2) plaintiff has severe impairments, to wit, depression, anxiety and post-traumatic stress disorder; 3) plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) plaintiff retains the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, unskilled work in a low-stress job; he can only perform occasional decision making and can tolerate only occasional changes in work setting; he can have no interaction with the public and only occasional interaction with co-workers; he cannot perform any tandem tasks; 5) plaintiff has no past relevant work; 6) plaintiff was forty years old when the application was filed so, by definition, he was a younger individual; 7) plaintiff has a high school

education and is able to communicate in English; 8) with no past relevant work, transferability of job skills is not an issue;  9) considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform; and 10) plaintiff has not been under disability, as defined in the Social Security Act, since August 13, 2013. (TR at 17-23.)

Plaintiff challenges the ALJ's decision on the grounds that the RFC findings were erroneous. (#28 at 2; #34 at 1.) Mr. Tanco argues "that the ALJ's RFC finding represents only his own unsupported and improper lay interpretation of medical evidence in the absence of supporting opinion or other evidence from medical experts." *Id.* (case citations omitted). The alleged error made with respect to the RFC is said to undermine the validity of the ALJ's findings at Step 5, and the ultimate conclusion Mr. Tanco was not disabled.

The legal principles on which plaintiff relies are well-established. The First Circuit has repeatedly held "that since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) ("With a few exceptions (not relevant here), an ALJ, as a lay person, is not qualified to interpret raw data in a medical record.");*Walker v. Berryhill*, No. 1:16-CV-11965-ADB, 2017 WL 5904637, at *8 (D. Mass. Nov. 30, 2017). That being said, "[t]he ALJ is nonetheless not precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment." *Walker*, 2017 WL 5904637, at *8 (internal quotations and citation omitted).

13

In his initial memorandum (#28), plaintiff's contentions are painted with a broad brush. Mr. Tanco does not dispute the ALJ's characterization of the evidence, nor does he identify what part of the RFC he views as constituting a lay interpretation of raw medical data. *See Greene v. Astrue*, No. CIV.A. 11-30084-KPN, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012). The ALJ's decision reflects his consideration of the entire record, including the functional limitations noted. Given more recent evidence and diagnoses, the ALJ discounted the opinions of the state agency psychological consultants, Mary Ford Clark, Psy. D., and Lawrence Fieman, Ed.D., that plaintiff did not have severe mental impairments. (TR at 21.) The ALJ observed that there was only limited evidence of psychological treatment from the alleged onset date in 2011 until plaintiff started therapy in 2015. *Id*. Dr. Kittay opined that plaintiff was able to learn new tasks with supervision, but could not function in "high structure capacity." *Id*. The ALJ afforded Dr. Kittay's opinions some weight. Great weight was assigned to the opinions of Dr. Husson, who found plaintiff's behavior to be mildly restricted, but goal-oriented and appropriate. *Id.* Dr. Husson opined that Mr. Tanco's depression appeared to be in partial remission, and that plaintiff would be capable of simple, repetitive and routine tasks. Dr. Husson also opined that Mr. Tanco displayed no major interpersonal difficulties, which the ALJ found was consistent with plaintiff's own testimony.

The ALJ weighed the various medical findings, including the functional limitations identified by the doctors, and assigned an RFC consistent with those findings. That no one medical opinion set forth all of limitations incorporated in the RFC is not dispositive. *Guzman v. Colvin*, No. 15-CV-230-PB, 2016 WL 1275036, at *2 (D.N.H. Apr. 1, 2016) ("An ALJ must therefore rely to some degree on RFC evaluations from a physician or another expert. This does not mean, however, that there must always be some super-evaluator, a single physician who gives the

factfinder an overview of the entire case. Rather, an ALJ may piece together the relevant medical facts from the findings and opinions of multiple physicians, and render common-sense judgments about functional capacity based on medical findings.") (internal quotations and citations omitted). In short, it is up to the ALJ to assess all of the relevant evidence and formulate the RFC based that evidence. *See* 20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 416.945(a)(1). In this instance, the ALJ made a judgment that is supported by substantial evidence.

In his response (#34) plaintiff pinpoints what he views as a specific, discrete error in the RFC: "In restricting Mr. Tanco to low-stress work . . . the ALJ" did not undertake a so-called *Lancellotta* analysis. *Id.* at 3 (citing *Lancellotta v. Sec'y of Health & Human Servs.*, 806 F.2d 284, 285 (1st Cir. 1986)). In *Lancellotta*, the First Circuit concluded that the ALJ's RFC was not supported by substantial evidence when, after finding that claimant suffered from a severe impairment and could not perform his past work, "[t]he ALJ made no findings on the nature of [claimant's] stress, the circumstances that trigger it, or how those factors affect his ability to work." *Lancellotta v. Sec'y of Health & Human Servs.*, 806 F.2d 284, 285 (1st Cir. 1986).

Here, in contrast, the ALJ delineated Mr. Tanco's limitations, and how those limitations impacted his ability to work, in the first hypothetical to the vocational expert:

> [A]ssume a hypothetical individual of the claimant's age, education, and work experience who has no exertional limitations. This is an individual who is limited to simple, unskilled work in a low stress job defined as only occasional decision-making, only occasional changes in work setting. This is an individual who can have only occasional interactions with coworkers, cannot perform tandem tasks.

(TR at 61.) The ALJ made individualized findings on the nature of plaintiff's stress. He defined, in functional terms, what he meant by a low stress job vis-a-vis plaintiff's limitations, i.e., simple, unskilled work with only occasional decision-making and only occasional changes in the work

setting. *See Pereira v. Berryhill*, No. CV 16-11855-FDS, 2017 WL 3567515, at *12 (D. Mass. Aug. 17, 2017) ("Here, the ALJ did not merely frame [claimant's] mental RFC in terms of ability to handle stress, requiring 'non-stressful work' or 'low stress in nature.' Instead, the ALJ specified that [claimant's] limitations permitted her to perform simple, routine, three to four-step tasks involving no more than occasional decision-making and changes in work setting."); *Thompson v. Berryhill*, 270 F. Supp. 3d 490 (D. Mass. 2017), No. 16-CV-10683-RWZ, 2017 WL 4157525, at *4 (D. Mass. Sept. 18, 2017);  *Degraffenreid v. Colvin*, No. 15-CV-10185-ADB, 2016 WL 5109509, at *8 (D. Mass. Sept. 20, 2016) ("[T]he ALJ did make findings on the nature of [claimant's] stress and how those factors might affect her ability to work, explaining that [claimant] was limited to 'low-stress work with only occasional decision-making and occasional changes in [the] work setting, but is unable to perform production rate or pace work.' This is all that *Lancellota* requires.") (*citing Justason v. Barnhart*, No. 05-55-P-C, 2005 WL 3263934, at *5 (D. Me. Nov. 30, 2005)).  The plaintiff's challenge is unavailing.  *Lancellotta* requirements were met here.

In sum, the ALJ's RFC, and his decision as a whole, are supported by substantial evidence and should be affirmed.

## V. CONCLUSION AND RECOMMENDATION.

I RECOMMEND that the Motion to Reverse (#28) be DENIED. I FURTHER RECOMMEND that Defendant's Motion for Order Affirming the Decision of the Commissioner (#32) be GRANTED and that judgment enter for defendant.

## VI. REVIEW BY DISTRICT COURT JUDGE.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly

indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See  Keating v. Secretary of Health & Human Servs*., 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc.  v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

January 30, 2018                                      /s/ M. Page Kelley
                                                      M. Page Kelley
                                                      United States Magistrate Judge